IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 05-00248 JMS-BMK |
| Plaintiff, | ) | |
| VS. | ) | |
| KEVIN PATRICK CASH, (03), | ) | MEMORANDUM OF LAW |
| Defendant. | ) | |

**MEMORANDUM OF LAW**

I.   <u>BACKGROUND</u>.

This case arose from the arrest of a drug courier flying heroin from Tijuana to Honolulu on May 29, 2005. That courier was Virginia Mercedes Rosas-Guerrero (RG).  RG named Kevin Patrick Cash (Kevin) as one of two men to whom she was bringing heroin, as she had on several other occasions.  The apprehension of RG was part of the investigation by the Department of Homeland Security of what the department dubbed the Perez-Medina Drug Smuggling Organization.

RG told the law enforcement officers who conducted her post-arrest interview that she had made more than 10 trips

to Honolulu bringing heroin.  RG said a larger portion of
the heroin was for "Bob" and a smaller portion was for
"Kevin."  Bob paid her $18,000 to $20,000 for the heroin he
bought.  Kevin paid her $2,000 to $4,000. (Exhibit A).  She
always met Kevin at the Ala Moana Shopping Center, and she
always met Bob at her hotel room.  RG said she met with Bob
on every trip to Honolulu, and with Kevin six to eight
times. (Exhibit A).

    After Kevin's arrest May 29, 2005, he made a voluntary
statement to law enforcement officers (LEOS).  He said he
went to Ala Moana Shopping Center that day to buy 2 ounces
of heroin from RG.  He knew RG as an agent of Ruby, who sold
heroin to him in February or March of 2005 in Waikiki.
(Exhibit B).  He bought heroin from RG six or seven times,
at $2,000 per ounce.  (Exhibit B).

    Kevin told the interviewing LEOS he is a heroin addict,
and that he was attempting to buy heroin for both personal
use and for distribution when he was arrested.  He admitted
he uses 1 gram of heroin per day.  (Exhibits B and C).

    Kevin gave the LEOS permission to search his apartment,
located in Kailua, on condition that he first be given a
chance to speak to his wife, Gerri.  That was arranged, and
Kevin and Gerri mutually consented to a search of their
apartment.  (Exhibit C).  Kevin gave the LEOS the locations

of drugs and firearms in his apartment.  No contraband was found  other than that identified by Kevin in advance of the search.

Unloaded firearms, some inoperable, two of which were antique cap and ball revolvers, and .22 and .25 caliber bullets were found in enclosed containers in Kevin's master bedroom closet.  A small amount of heroin was found hidden in the pencil sharpener on his desk in the bedroom. (Exhibit C and D).

In a Fourth Superseding Indictment Kevin was charged with four offenses summarized as follows:

Count 1 - conspiracy to distribute 100 grams or more of heroin in violation of 21 USC 846, 841(a)(1) & (b)(1)(B).

Count 3 - possession of a firearm and ammunition as an unlawful user of a controlled substance in violation of 21 USC 802 and 18 USC 922(g)(3) and 924(a)(2).

Count 4 - attempted possession of heroin in violation of 21 USC 841(a)(1) and 841 (b)(1)(B).

Count 5 - possession with intent to distribute heroin within 1000 feet of a school in violation of 21 USC 841 (a)(1), (b)(1)(B) and 860.

The Fourth Superseding Indictment was preceded by a series of indictments and charging instruments containing add-on charges.  A criminal complaint filed May 31, 2005 charged only conspiracy as did a first superseding indictment filed August 24, 2005.  An information filed

September 20, 2005 added the firearms charge, as did a second superseding indictment filed October 26, 2005. In late September 2005 Kevin opted to go to trial. A third superseding indictment filed November 22, 2005 added the attempt charge, and a fourth filed March 15, 2006 added the schoolyard charge.

Trial began with jury selection on April 25, 2006. Between October 3, 2005 and the end of trial on May 3, 2006, Kevin was on supervised release to the Ho'omau Ke Ola substance abuse treatment program. Following his conviction of all four counts, he was returned to custody pending sentencing. PSI ¶ 65,66,67.

At trial Kevin unsuccessfully asserted defenses against two of the four charges, Count 1, conspiracy, and Count 5, the schoolyard charge. As to the conspiracy charge Kevin raised the buyer-seller defense, wherein he admitted to being a buyer from the conspiracy, but not to being a member of the conspiracy. At the close of the evidence, the court found the defense had adduced sufficient evidence that a buyer-seller jury instruction was warranted. As to the schoolyard charge, Kevin raised the defense of insufficient evidence of an intentional state of mind with respect to the intent to distribute element.

A proposed presentence report (PSI) was completed on

4

July 24, 2006. That report computed Kevin's base offense level to be 26 based upon drug quantity, recommended a 2-level increase for possession of a gun, and no decrease for acceptance of responsibility, for a total offense level of 28. PSI ¶42-45, 50. Under the category "Personal and Family Data" in ¶60, the report mentions that Kevin's parents divorced, and his mother remarried when he was 5. It omits that Kevin acquired his hobby of gun collecting from his step-father, Charles Kaulukukui, who was a National Guard marksman. Mr. Kaulukukui collected guns and bows and arrows, which were on display on the living room wall when Kevin lived with his mother and step-father. As a child Kevin learned to disassemble and reassemble guns from his step-father.

As mentioned in PSI ¶56, Kevin was collecting guns for display purposes, and the ammunition in the closet was not connected to the guns. The ammunition was given to him by a friend who was clearing out his house to move to the Big Island. The bullets were in a military ammunition can, which Kevin stored it in the closet without any plans for it.

Kevin set forth his objections and corrections to the proposed PSI report in a sentencing statement filed on August 3, 2006. This memorandum expands on the reasons for

Kevin's corrections to the proposed PSI report and to add reasons the Court should correct, or, in the alternative, should depart downward from the advisory base offense level.

The government filed a sentencing memorandum requesting a base offense level of 36.

II.  ISSUES.

    A.  WAS THE 2-LEVEL INCREASE FOR FIREARM POSSESSION INAPPLICABLE FOR CLEAR IMPROBABILITY THE FIREARMS WERE CONNECTED TO THE OFFENSE UNDER THE CIRCUMSTANCES?

    B.  IS DOWNWARD DEPARTURE WARRANTED FOR ACCEPTANCE OF RESPONSIBILITY WHERE KEVIN VOLUNTARILY MADE A STATEMENT ADMITTING HIS INVOLVEMENT, CONSENTED TO A SEARCH OF HIS APARTMENT, ADMITTED TO BEING A BUYER FROM THE CONSPIRACY, AND REASONABLY RAISED A REASONABLE DOUBT DEFENSE TO THE BELATED SCHOOLYARD CHARGE?

    C.  DO KEVIN'S SINCERE EFFORTS IN SUBSTANCE ABUSE REHABILITATION TREATMENT SUPPLY INDEPENDENT GROUNDS FOR DOWNWARD DEPARTURE?

    D.  WAS THE CIRCUMSTANTIAL EVIDENCE SURROUNDING THE SCHOOLYARD CHARGE A STRONG MITIGATING FACTOR IN LIGHT OF THE POLICIES AND PURPOSES BEHIND THE SCHOOLYARD STATUTE?

    E.  ARE THERE MITIGATING FACTORS INHERENT IN THE GOVERNMENT'S CONTINUOUS ADVERSE REACTION TO KEVIN'S DECISION TO EXERCISE HIS CONSTITUTIONAL RIGHT TO A TRIAL?

III.  ARGUMENTS.

    A.  THE 2-LEVEL INCREASE FOR FIREARM POSSESSION IS INAPPLICABLE BECAUSE THERE WAS NO CONNECTION BETWEEN THE POSSESSION AND THE COMMISSION OF

THE UNDERLYING HEROIN DISTRIBUTION CONSPIRACY
OFFENSE.

As reflected in his sentencing statement filed on
August 3, 2006, Kevin objects to the PSI's 2-level increase
in base offense level based on the collection of guns found
stored in his closet.  The circumstantial evidence,
including the variety, condition, storage method, and other
circumstantial evidence support Kevin's contention that it
is clearly improbable that the guns were in any way
connected with the drug offenses.

A specific offense characteristic that generates a 2-
level increase in base offense level is "If a dangerous
weapon (including a firearm) was possessed..."  U.S.S.G. §
2D1.1.  A "firearm" is defined as "any weapon (including a
starter gun) which will or is designed or may readily be
converted to expel a projectile by the action of an
explosive."  U.S.S.G. § 1B1.1(1)(e).     Application note 3
to U.S.S.G. § 2D1.1(b)(1) states:

> The enhancement for weapons possession
> reflects the increased danger of violence
> when drug traffickers possess weapons.
> The adjustment should be applied if the
> weapon was present, unless it is clearly
> improbable that the weapon was connected
> with the offense.  For example, the
> enhancement would not be applied if the
> the defendant, arrested at his residence,
> had an unloaded hunting rifle in the
> closet.

The Ninth Circuit analyzes circumstantial evidence to determine whether possession of firearms occurred during the commission of a drug offense, and whether or not it is clearly improbable that the guns were connected with the offense.  U.S. v. Willard, 919 F.2d 606 (9th Cir. 1990).

The Guidelines provide a list of circumstantial evidence factors to determine whether firearms possessed by one charged with a firearms offense were possessed for lawful sporting purposes or for collection.  Under U.S.S.G. §2K2.1, comment (n.10), relevant considerations are: the type and number of firearms, amount and type of ammunition, location and circumstances of possession, actual use, nature of the defendant's criminal history, and the extent to which local law restricted possession.

Kevin's possession of the firearms did not violate State law in place at the time of his ancient felony conviction.  Kevin's only prior felony was for a burglary on March 16, 1978 (Exhibit D) did not result in an order that he may not own or possess a gun.  Hawaii's prohibition of firearm possession for one convicted of a felony was enacted in 1988 (Exhibit E).  HRS § 134-7(b).  Refraining from firearm possession was also not a condition of Kevin's probation for the burglary offense. (HRS § 706-624(j); Exhibit D; PSI ¶56,57).

8

The circumstantial evidence supports the contention that Kevin had specific intentions with respect to all of the guns stored in his closet. His contention is that he planned to someday restore the broken ones and to build a display case for all of them. All of the guns were strictly for collection purposes, a hobby he acquired as a young boy from his step-father. His step-father, a marksman, was and avid collector of guns and bows and arrows. Mr. Cash grew up around gun collections displayed in glass-covered cases.

The discovery in this case, attached as Exhibit F, reflects that investigators recognized two of the guns as antique collectors' items and returned them to Mr. Cash's spouse. *See, e.g.,* U.S. v. Moit, 100 F.3d 605 (8th Cir. 1996) ("Moit noted that the age of some of the weapons indicated they were antique firearms of the type one would collect.") "The cap and ball pistol is a model of a late nineteenth century Colt revolver. In order to fire the weapon, gun powder and lead balls must be poured into the chamber and a cap placed under the firing hammer. When the hammer is released, it strikes the cap causing a spark. The spark explodes the gun powder which in turn propels the lead balls out of the chamber." U.S. v. North, 900 F.2d 131,134 (8th Cir. 1990).

Of the non-antique 5 guns, two rifles and three

revolvers, two were inoperable. One revolver had a broken
trigger (photo 15). One rifle was "rusted out."
Ultimately, the government charged Kevin only for the
unloaded 357 Magnum, which would be a collector's item just
as easily as a weapon to protect illegal drugs. The
undisputed evidence at trial was that gun was securely
encased, unloaded, and without accompanying ammunition. It
was also undisputed that Kevin did not run a "drug house,"
with cars coming and going at all hours as if the house were
a fast food drive-up window. Instead, the evidence at trial
was that he made his purchases 25 miles away from home.
There was no evidence where he drove after that. Had Kevin
possessed the firearms in connection with his drug
trafficking activity, he would certainly have possessed them
where the transactions took place, not many miles away.

In contrast to unloaded and broken guns in a closet in
holsters and bags, firearms intended to promote drug
trafficking activity would be expected to be loaded, easily
accessible, operable, and with matching ammunition. *See,
e.g.,* U.S. v. Rodrigues-Nuez, 919 F.2d 461 (7th Cir. 1990),
U.S. v. Cazares, 121 F.3d 1241 (9th Cir. 1997), U.S. v. Moit,
100 F.3d 605 (8th Cir. 1996). In the instant case, the
locations and conditions of the guns reflect no thought of
use for even simple burglary protection purposes, let alone

drug trafficking.  The proverbial burglary-protection gun
would be in a night stand drawer next to the bed.  The
possession here was analogous to the "unloaded hunting rife
in the closet" example in U.S.S.G. § 2D1.1 Application Note
3.

Accordingly, the 2-level enhancement is inappropriate
in this case.

B.    A 2-LEVEL DECREASE OR DOWNWARD DEPARTURE IS
WARRANTED FOR ACCEPTANCE OF RESPONSIBILITY AND
POST-ARREST REHABILITATIVE EFFORTS.

As noted in PSI ¶ 24 and 25, Kevin waived his *Miranda*
rights and made a statement and consented to a search of his
home.  (Exhibits B and C).  At trial he contested two of the
four charges against him.  He accepted responsibility for
being a buyer from a conspiracy but not for being a member
of it.  He challenged the applicability of the conspiracy
law to his conduct, invoking the buyer-seller defense.  The
buyer-seller defense is a fact-intensive totality question.
Kevin also challenged the belated, add-on schoolyard count
on the grounds of insufficient evidence.  While awaiting
trial, Kevin completed a substance abuse program under the
supervision of pretrial services and earned a clinical
discharge.  (Exhibit    G).

The guidelines provide for a decrease in offense level
for acceptance of responsibility under U.S.S.G. § 3E1.1,

which states in pertinent part:

> (a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

> (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:
> (1) timely providing complete information to the government concerning his own involvement in the offense;
> . . .

"Conviction by trial...does not automatically preclude a defendant from consideration for such reduction.  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt..."  Commentary, U.S.S.G. § 3E1.1.  One example is going to trial to challenge the applicability of the statute to the defendant's conduct.

The Application Notes to U.S.S.G. § 3E1.1 contain several factors that apply to Kevin's case.  He did not frivolously contest relevant conduct, he truthfully admitted drug possession and distribution to support his own addiction, and he voluntarily assisted the authorities in

12

the recovery of the contraband he had in his home.
Moreover, he successfully completed drug rehabilitation
treatment. § 3E1.1 Application Notes (a), (e), and (g).

The guidelines aptly provide a substantial decrease in
offense levels based on acceptance of responsibility.  An
early plea of guilty is favored for practical economic
reasons in U.S.S.G. §3E1.1.(b)(2).  Saving the government
and defense from preparing for trial in turn saves
government resources.  There is no question that, although a
fundamental constitutional right, a trial is a costly
undertaking.  Indeed, it would cripple the criminal justice
system if all accused defendants demanded a jury trial.

The guidelines and criminal code contain myriad
inducements to plead guilty, in addition to the guidelines'
acceptance of responsibility offense level reduction scheme,
e.g., mandatory minimum terms and safety valves, and the
subjective alleviation of public safety concerns that
accompanies a demonstration of remorse which promotes
leniency.

This having been said, the guidelines also recognize a
jury trial can benefit and streamline the criminal justice
system.  This is such a case.  Looking to precedent from
cases that have been tried is essential to a defense
attorney's ability to advise a client on the possible

13

consequences of a plea agreement versus a trial.  Every case is factually different.  This is especially true where the defense, should the client choose trial, presents a fact-intensive totality of the circumstances question, such as the buyer-seller defense.

In a situation such as Kevin's, where a potential defense presents a totality question, and where the case precedent is sparse, a trial can spur similarly situated defendants to opt for a guilty plea.  In other words, a trial such as was held in Kevin's case can, in the long run, save the court's resources for years to come.  That is because defense attorneys can point to the totality and predict likely outcome in a more convincing, less speculative manner.  For example, the outcome may have been different if Kevin had made fewer purchases from RG.  On the brink of trial in this case, the co-defendant opted for a guilty plea following jury selection.  This demonstrates that a trial can alleviate further burdens on the system from related cases.

A trial is a necessary learning experience for court staff, similarly situated accused persons, the attorneys, law enforcement, and the jurors themselves.  In the instant case, 12 citizens from all walks of life had the experience of looking at the tragic faces of drug couriers so

14

desperately poor they are willing to smuggle heroin.

Under the facts here, where Kevin had no reason to know he was buying from a direct courier, it is only normal to dispute a sweeping conspiracy charge. The very term "conspiracy" has sinister connotations in a variety of historical contexts. For example, typical victims of paranoid delusions may believe a stranger on the street is an undercover agent spying on them. Irrational fears of conspiracy with the enemy led to the internment of loyal Japanese-American citizens during World War II. An elaborate conspiracy brought down the World Trade Center.

A desire to avoid the brand of conspiracy membership, the label of "co-conspirator," should not be interpreted as a lack of remorse in an individual such as Kevin, who had relatively a minor role in the heroin distribution network in this case. Overall, like "conspiracy" in other contexts, there is something unsavory about being held responsible for drugs possessed by others in much greater quantities than one's own. Membership in a conspiracy is arguable for one who has a minor role, hence the buyer-seller defense. A reasonable jury could have determined Kevin was merely a buyer from the conspiracy, or that he was a member, by weighing a number of factors. Thus, Kevin's challenge to conspiracy membership should not preclude an offense level

reduction for acceptance of responsibility.

Here, Kevin saved the government from obtaining a search warrant, saved the labor of the search of his residence by correctly naming the locations of the contraband, admitted to all his transactions with RG and Ruby, despite the fact that he was not required to relate prior transactions to obtain an acceptance of responsibility decrease.  The government was willing to expend considerable resources for a series of superseding indictments and investigations against Kevin once he opted for trial.

Kevin's pretrial statements and conduct assisted the government in the recovery of the fruits and instrumentalities of the crime, and he engaged in earnest efforts at rehabilitation by earning a clinical discharge from a structured program of substance abuse treatment. U.S.S.G. § 3E1.1 Application Notes 1(a),(e),(g).  Not only does Kevin's substance abuse treatment present an acceptance of responsibility appliciation factor, but it can also provide a separate justification for downward departure under Part K in conjunction with 18 U.S.C. § 3553(a) as explained in U.S. v. Booker, 125 S.Ct. 738 (2005).  Booker excised the mandatory aspect of the guidelines.

    C.    DOWNWARD DEPARTURE IS WARRANTED BECAUSE KEVIN MADE SINCERE EFFORTS TO ADDRESS HIS SUBSTANCE ABUSE PROBLEM WHILE AWAITING TRIAL.

As reflected in the PSI, Kevin began using heroin in
his 20's and was a heavy user at the time of his arrest at
the age of 48.   PSI ¶ 65.   He participated in the Ho'omau Ke
Ola substance abuse treatment program from October 4, 2005
to the end of his trial on May 3, 2006.   PSI ¶ 66, (Exhibit
).   Kevin's entry into residential treatment was challenged
after Kevin unexpectedly opted for trial after supervised
release had been granted under a change of plea expectation.

Over two months after Kevin entered Ho'omau Ke Ola, a
program designed for Native Hawaiians, the program director,
John J. Connolly, wrote a positive progress report to the
Court.   (Exhibit G).   Mr. Connolly described a dramatic
improvement in Kevin's adjustment, from initial
reclusiveness to open participation.   Mr. Connolly wrote,
"There is no doubt that Kevin has come along (sic) way in
his recovery in three short months."   *Id.*

Mr. Connolly went on to describe the components of the
program: group therapy, individual psychotherapy, 3-5
Narcotics Anonymous meetings per week, and an overall
therapeutic environment.   *Id.*   Kevin demonstrated motivation
to maintain a drug-free lifestyle, and earned increased
privileges as he moved up the step-level ladder, including
Saturday visits with his wife.   *Id.*

After completing the residential phase of the program,

Kevin entered the 16-week intensive outpatient phase of treatment, which included meetings from 9 to noon on Mondays, Tuesdays and Fridays. During this phase, Kevin lived in a clean and sober home affiliated with the program. Kevin suffered a relapse on March 3, 2006 after which he turned himself in and expressed remorse. Kevin earned clinical discharge on April 20, 2006. (Exhibit G).

Mr. Connelly testified at a reconsideration hearing appealing his supervised release on November 4, 2005. He testified that in addition to the behavior modification and therapeutic components of the program, the Ho'omau Ke Ola program also includes an educational component of classes in Native Hawaiian history and culture. Mr. Connelly also testified he had no safety concerns because of the firearms in Kevin's closet.

There are mitigating factors warranting downward departure from the guideline range, not only because Kevin made a sincere effort to address his heroin addiction, but also in the policies underlying the guidelines. The District Court for the Southern District of New York philosophized about the paradox inherent in the sentencing guidelines' use of quantity of drugs as a measure of the seriousness of the offense. In U.S. v. Williams, 78 F.Supp. 2d 189 (S.D.N.Y. 1999), the court gave reasons that the

18

sentencing court had a **duty** to depart from the guidelines in appropriate cases:

> In the introduction to the Sentencing Guidelines the Sentencing Commission noted: "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." (Citation omitted). Unfortunately, as prosecutors and the courts have endeavored to apply the Guidelines to accomplish this laudable goal, we sometimes overlook the fact that ending disparity for similar offenders was not the only, or even the primary, congressional goal...Congress and the Commission recognized that there are two types of disparity in sentencing. The first is the disparity found when two defendants who commit the same crime in identical circumstances receive different sentences. ***The second exists when the same sentence is imposed on two people whose crimes or circumstances are significantly different.*** Id. (Emphasis added.)

Williams was arrested for selling 29 grams of heroin. He grew up in poverty and began using drugs at age 10. By age 21 he had accumulated three prior felony drug offenses for selling small amounts of heroin or cocaine to undercover police. His prior convictions placed him in career criminal Category VI, resulting in a guideline range of 262 to 327 months.

In the Court's view drug cases call for a "refined assessment" of the totality of facts to distinguish whether a defendant is a "significant narcotics dealer" or a street seller. This determination may have no bearing on the drug

quantity involved.   The Court explained:

> A significant narcotics dealer may be arrested
> in possession of only a small quantity of drugs
> or may have been arrested after producing only
> a small amount of narcotics as a sample of his
> wares.
>
>                    . . .
>
> In each of his prior convictions Williams was
> a street seller of narcotics – the lowest level
> on the distribution chain.  Not only did this
> make him the least significant member of the
> distribution chain, but it made him the person
> most likely to be arrested and convicted since
> he was out on the street where he could easily
> be observed and approached by the police.  *Id.*
> at 193.

Like Williams, Kevin operated at a low level on the

distribution chain, an addict who sells enough to support

his own habit.  Kevin's purchases from RG were small enough

to indicate he was at the lowest level of the distribution

chain.  He did not distribute other distributors, but rather

to other users.  None of the records found in his apartment

supported the record-keeping needed to keep track of the

profits of lower level distributors.  There was no computer

found.  There was also no evidence to reflect that he knew

RG personally brought the heroin by plane, as opposed to

receiving it from someone else who got it through the mail

from someone else, for example.  There was no evidence that

Kevin knew RG brought $18,000 to $20,000 worth of heroin to

Co-Defendant Siguoin.

 To fairly measure Kevin's offense level, as a minor

role player with respect to the conspiracy, and considering that a drug quantity measure of offense level can lead to disparity, Kevin should be granted a downward departure for his sincere efforts at self-rehabilitation.

      D.    WHILE THE JURY REJECTED THE REASONABLE DOUBT
             DEFENSE TO THE SCHOOLYARD CHARGE, THE
             CIRCUMSTANTIAL EVIDENCE PRESENTS A STRONG
             MITIGATING FACTOR SINCE
             THOSE CIRCUMSTANCES DO NOT PRESENT THE DANGER THE
             STATUTE WAS DESIGNED TO PREVENT?

During its three hours of deliberations, the jury asked one question of the Court, and that question related to the schoolhouse charge. The jury asked whether the government must prove the substance possessed within 1,000 feet of a school was intended for distribution within that distance. The same question generated appeals in several circuits. In U.S. v. Rodrigues, 961 F.2d 1089 (3ʳᵈ Cir. 1992), the Court held that the schoolyard statute applies to a defendant who possesses drugs within 1,000 feet of a school if that possession is with the the intent to distribute those drugs at any location. *Id.* at 1095. The Court used the plain language of the statute to conclude, "...Congress undoubtedly knew that the mere presence of substantial quantities of drugs increases the risk of gunfire and other violence." (Citation omitted). In addition, a person possessing drugs may abandon them while fleeing from the police, as Rodrigues did here. The drugs may also be lost

or stolen near a school and may then find their way into students' hands." 961 F.2d at 1094.

The defense here submits that none of these dangers was present from the facts adduced at trial. During closing arguments the defense argued the government had failed to prove beyond a reasonable doubt that the 2.8 grams of heroin hidden in Kevin's pencil sharpener were intended by him for distribution and not for personal use. At trial DEA Agent Gerald Lawson, a veteran of 11 years, testified as an expert that the amount of heroin found in Kevin's pencil sharpener is not, in itself, indicative of intent to distribute that heroin. However, he said, when put together with other circumstantial evidence, that amount could be indicative of such an intent. Agent Lawson also confirmed that a heroin user who uses 1 gram per day would be considered a "heavy user." Agent Lawson also confirmed that a heroin user who also sells heroin to support their own habit is the second lowest level on the drug distribution chain, the lowest level being the addict who is strictly a user.

In closing the defense pointed to the circumstantial evidence that Kevin acquired heroin 25 miles from his home, and there was no evidence of where he took it after that. Agent Lawson testified that normally a distributor would have a gram scale to measure distribution amounts. The

defense pointed to the circumstantial evidence that Kevin fully cooperated with law enforcement following his arrest, providing a *Mirandized* statement, and consenting to a search of his residence. That consent was conditioned on an opportunity to forewarn his wife, who, he said, would be mad at him. The heroin was hidden in a pencil sharpener. The strongest circumstantial evidence indicative of a distribution intent was a supply of balloons, which Agent Lawson and the case agent said were unique to heroin distribution. The defense also pointed out that the schoolyard investigation was an add-on investigation, conducted long after numerous LEOS had thoroughly searched Kevin's apartment.

Additionally, there was no evidence that Kevin ran a "drug house" associated with many drug arrests, where the neighbors notice automobile traffic going to and from the house at all hours.

Although the jury declined to give Kevin the benefit of the doubt that the heroin Kevin picked had was for personal use only, for sentencing purposes these circumstances indicate Kevin's situation carries little threat of the dangers that concerned Congress in formulating the 1,000-feet offense.

E.    A HOSTILE ATMOSPHERE SURROUNDED THIS CASE
       FOLLOWING

THE FAILURE OF PLEA NEGOTIATIONS WHICH RAISES DUE
PROCESS CONCERNS THAT BELONG ON RECORD.

On November 18, 2005 the government's counsel
telephoned defense counsel and inquired of defense counsel
whether defense counsel had informed the Defendant that it
would not be a good idea to go to trial.  The government's
counsel also advised defense counsel that if defense counsel
did not so inform the Defendant, the failure to do so is
"ineffective right there."  The government's attorney also
informed defense counsel he would bring add-on charges.
Defense counsel made a note of this phone call in defense
counsel's case log, which is attached as Exhibit H.

After jury selection in this case, the co-defendant
entered a plea of guilty.  Following the co-defendant's plea
of guilty both the government's counsel and the case agent
pressured defense counsel to advise the Defendant to do the
same.  These two matters are hereby placed in the record.

The other adverse reactions to Kevin's rejection of the
government's plea offer are in the record.  The government's
continued posture is reflected in its sentencing memorandum.
Plea negotiations were marred by the government's
misconceptions of fact, suspicions that Kevin's supervised
release was an escape ploy, and attempts to have defense
counsel removed from representing Kevin.  In its sentencing
memorandum, the government continues to express the view

24

that Kevin knew RG was a courier as opposed to a street-level seller, which the defense submits is unsupported in the record.

Misconception of critical fact

In the course of pretrial proceedings, the government filed numerous pleadings, each containing a "Statement of Facts" section. All of those purported statements of fact contain a misstatement of a critical fact, the location of a $3,500 drug transaction between Kevin and RG. That misstatement was apparently drawn from the same misstatement from the case agent's investigation summaries. (Exhibit A). Both the government and the case agent wrote the transaction took place in RG's hotel room as opposed to the sidewalks of Waikiki or Ala Moana Shopping Center. The case agent wrote:

> Cash arrived in a multi-colored truck with racks, picked up ROSAS GUERRERO, and drove her to her hotel. They both went to her room, where Cash paid Ruby Perez (sic) $3,500. (Exhibit A).

In contradiction the same case agent wrote, "ROSAS GUERRERO always met CASH at the Ala Moana Shopping Center and conducted the exchange in his truck." (Exhibit A).

The government repeatedly wrote:

> While waiting outside Sears near Old Navy, Cash arrived at the mall in his truck and picked up Guerrero and took her to her Hotel. At the hotel, Cash exchanged $3,500 with Guerrero for heroin.

25

See, e.g., United States of America's Trial Memorandum filed on November 30, 2005, page 4; United States Motion to Revoke the United States Magistrate's Pre-Trial Release Order and to Detain Defendant Pending Trial filed November 2, 2005, pages 2-3; United States of America's Memorandum in Opposition to Defendant's Motion to Sever filed on January 23, 2006, page 3, and United States' Response and Opposition to Defendant Cash's Motion in Limine No. 1, page 3.

By the time of trial the government had apparently learned the oft-mentioned hotel room transaction was untrue. This factual misconception is important because Kevin claimed he was a buyer from what he thought were street level sellers.  If he had conducted a transaction in the hotel room, this would tell him he might be dealing with a courier, as opposed to a dealer further removed from the conspiracy.  Such a fact, if true, would have fallen into the column of facts damaging to any buyer-seller defense claim.

Improper voir dire and opening statement attempts

In its efforts to refute Kevin's buyer-seller defense, the government sought to indoctrinate the jury on the conspiracy law through proposed voir dire questions that were no more than indoctrination and argument.  In its proposed voir dire questions filed on April 11, 2006, for

26

example, the government asked the Court to tell the
prospective jurors, "Do you understand that someone who
willfully participates in an unlawful plan which comprises
the conspiracy is as responsible for it as all other members
of the conspiracy even if the person does not have full
knowledge of all the details of the conspiracy?"

Having failed to use voir dire for conspiracy law
indoctrination purposes, the government attempted to do so
in its opening statement, generating a rapidly sustained
objection.  Ironically the government had filed a motion in
limine admonishing the defense to refrain from improper
opening statements.  Thus the government moved for an order
precluding improper opening statements from the defense,
citing, *inter alia*, U.S. v. Dinitz, 424 U.S. 600 (1976).
Moreover, the government quoted liberally from Dinitz, a
quote which included the statement, "...it is fundamentally
unfair to an opposing party to allow an attorney, with the
standing and prestige inherent in being an officer of the
court, to present to the jury statements not susceptible of
proof but intended to influence the jury in reaching a
verdict."  424 U.S. at 612.

The government's attempts to improperly use voir dire
for legal indoctrination and to violate its own motion in
limine in its opening statements reflects that Kevin's

challenge to the conspiracy charge should not preclude an acceptance of responsibility enhancement, as argued in argument B above.

Undue pressure on the defense raises due process concerns and, for sentencing purposes, is presented as a mitigating factor.

IV.  CONCLUSION

Based on the foregoing points and authorities, Kevin Cash respectfully requests this Honorable Court to find sufficient authority in the law and facts of this case to correct the guideline range by deleting the firearms increase and granting a 2-level acceptance of responsibility decrease, and  to depart downward to a guideline range of 23 based on the need for the sentence imposed under 18 U.S.C. § 3553, and accordingly to sentence Kevin Cash to no more than the applicable 60-month mandatory minimum term.

DATED:  Honolulu, Hawaii, _August 18, 2006_ .

_Mary Ann Barnard_
MARY ANN BARNARD
ATTORNEY FOR DEFENDANT
KEVIN PATRICK CASH